IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION


PROGRESSIVE GULF INSURANCE COMPANY                    PLAINTIFF

VS.                        CIVIL ACTION NO. 5:12-cv-109(DCB)(MTP)

ESTATE OF GEORGE L. JONES;
THREE RIVERS TRANSIT; C&W
HOMES, INC.; INFANT DAUGHTER OF
PARIS BUCKNER, BY AND THROUGH
GRACIE AND SONNY WILLIAMS;
ESTATE AND/OR HEIRS OF PARIS BUCKNER;
ESTATE AND/OR HEIRS OF MARGARET
BUCKNER; AND JOHN/JANE DOES 1-10                       DEFENDANTS


MEMORANDUM OPINION AND ORDER

This cause is before the Court on the plaintiff Progressive

Gulf Insurance Company ("Progressive Gulf")'s Motion for Summary

Judgment **(docket entry 13)**. Having carefully considered the

motion, the response of defendants Infant Daughter of Paris

Buckner, by and through Gracie and Sonny Williams, and the Estate

and/or heirs of Paris Buckner (collectively "the Buckner Estate"),

the memoranda of the parties and the applicable law, and being

fully advised in the premises, the Court finds as follows:

In this declaratory judgment action, Progressive Gulf seeks a

declaration that a contract of insurance between Progressive Gulf

(the insurer) and George L. Jones ("Jones") / Three Rivers Transit

(the insureds) does not provide a defense or indemnity to the

Estate of George L. Jones ("Jones Estate"), or to any of the

defendants, for the claims arising from a May 5, 2012, automobile

collision of vehicles driven by Jones and Paris Buckner

("Buckner"), resulting in Buckner's death.  Asserting that there
are no genuine issues of material fact, and that it is entitled to
judgment as a matter of law, Progressive Gulf moves for summary
judgment.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure,
a party is entitled to summary judgment in its favor if it "shows
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed.R.Civ.P.
56(a).  "The party moving for summary judgment bears the initial
responsibility of informing the district court of the basis for its
motion, and identifying those portions of the record which it
believes demonstrate the absence of a genuine issue of material
fact."  <u>Canal Ins. Co. v. Herrington</u>, 846 F.Supp.2d 654, 657 (S.D.
Miss. 2012)("<u>Herrington</u>")(citations and internal quotation marks
omitted).  "The nonmoving party must then go beyond the pleadings
and designate specific facts showing that there is a genuine issue
for trial."  <u>Id</u>.  Factual controversies are to be resolved in favor
of the nonmovant, "but only when ... both parties have submitted
evidence of contradictory facts."  <u>Id</u>.  "Conclusory allegations,
speculation, unsubstantiated assertions, and legalistic arguments
have never constituted an adequate substitute for specific facts
showing a genuine issue for trial."  <u>Id</u>.  "The interpretation of an
insurance policy's language presents a question of law."
<u>Herrington</u>, 846 F.Supp.2d at 657.  "The Court must give effect to

the plain meaning of an insurance policy's clear and unambiguous language." Id. at 658.

Progressive Gulf asserts that its policy specifically requires that the accident must arise out of the use of an "insured auto" in order to implicate coverage. At the time of the accident, which occurred on May 5, 2012, in Hollandale, Mississippi, Jones was operating a 1991 Volvo truck which Progressive Gulf contends was not, and had never been, a listed vehicle on Jones's commercial automobile insurance policy.

The commercial auto policy in issue was issued to Jones and Three Rivers Transit, and underwritten by Progressive Gulf. The policy period was October 27, 2011 through October 27, 2012. The policy listed one vehicle; it did not list the 1991 Volvo truck involved in the accident. Progressive Gulf Insurance Policy 08299832-0. The Insuring Agreement, Part I, of the insurance contract between Progressive Gulf and Jones provides as follows:

> **INSURING AGREEMENT - LIABILITY TO OTHERS**
>
> Subject to the Limits of Liability, if **you** pay the premium for liability coverage, **we** will pay damages, OTHER THAN PUNITIVE OR EXEMPLARY DAMAGES, for **bodily injury, property damage,** and **covered pollution cost or expense**, for which an **insured** becomes legally responsible because of an **accident** arising out of the ownership, maintenance or use of an **insured auto**.

Id., Part I, Liability to Others, p. 10. Thus, according to the Progressive Gulf policy, in order to implicate liability coverage, the accident must arise out of the use of an "insured auto."

The Insuring Agreement, Part II, of the insurance contract between Progressive Gulf and Jones provides:

**INSURING AGREEMENT – COLLISION COVERAGE**

Subject to the Limits of Liability, if **you** pay the premium for Collision Coverage, **we** will pay for **loss** to **your insured auto** and its equipment when it collides with another object or overturns.

Id., Part II, Damage to Your Auto, p. 22. Thus, according to the Progressive Gulf policy, in order to implicate collision coverage, claims for property damage must likewise arise from the use of an "insured auto."

The Insuring Agreement, Part II, of the insurance contract between Progressive Gulf and Jones also provides:

**INSURING AGREEMENT – COMPREHENSIVE COVERAGE**

Subject to the Limits of Liability, if **you** pay the premium for Comprehensive Coverage, **we** will pay for **loss** to **your insured auto** and its equipment from any cause other than those covered under Collision Coverage.

Id., Part II, Damage to Your Auto, p. 22. Thus, according to the Progressive Gulf policy, in order to implicate comprehensive coverage, claims for property damage must also arise from the use of an "insured auto."

The policy's definition of "**insured auto**" or "**your insured auto**" is as follows:

a. Any **auto** specifically described on the **Declarations Page**, unless **you** have asked **us** to delete that **auto** from the policy.

b. Any additional **auto** on the date **you** become the owner

4

if:

      (I) **you** acquire the **auto** during the policy period shown on the **Declarations Page;**

      (ii) **we** insure all **autos** owned by **you** that are used in **your** business; and

      (iii) no other insurance policy provides coverage for that **auto.**

c. Any replacement **auto** on the date **you** become the owner if:

      (i) **you** acquire the **auto** during the policy period shown on the **Declarations Page;**

      (ii) the **auto** that **you** acquire replaces one specifically described on the **Declarations Page** due to termination of **your** ownership of the replaced **auto** or due to mechanical breakdown of, deterioration of, or **loss** to the replaced **auto** that renders it permanently inoperable; and

      (iii) no other insurance policy provides coverage for that **auto.**

<u>Id</u>. at pp. 4-5.

The 1991 Volvo truck that Jones was operating at the time of the accident was not listed or "specifically described" on the Declarations Page. It is undisputed that Jones had owned the vehicle since August of 2009. Therefore, the vehicle was not purchased during the policy period shown on the Declarations Page. The vehicle involved in the accident is clearly not an "insured auto," as that term is defined by the policy. Thus, the policy does not afford liability, collision, or comprehensive coverage for the accident or any claims arising therefrom. <u>See</u> <u>Herrington</u>, 846

F. Supp. 2d at 658 (finding that tractor-trailer involved in accident was not a described auto in insurance policy; thus, it was not a covered auto under the policy).

At the time of the accident, Jones was pulling a mobile home with the 1991 Volvo truck. Coverage under Part I of the policy, including the duty to defend, does not apply to: "Property damage to ... any property ... being transported by, used by, or in the care, custody or control of an insured, including any motor vehicle operated or being towed." Insuring Agreement, Policy Exclusions, p. 16. Thus, the policy specifically excludes coverage for any damage to the mobile home being transported at the time of the accident.

The Buckner Estate has now conceded that the Progressive Gulf policy excludes coverage for George Jones / Three Rivers Transit under the general terms of the policy. See The Buckner Estate's Memorandum Brief in Support of Amended Response in Opposition to Motion for Summary Judgment, p. 6 (docket entry 30).

However, the Progressive Gulf policy also includes an endorsement, Form MCS-90, which the Buckner Estate contends covers the accident in question. The "Endoresement for Motor Carrier Policies of insurance for Public Liability Under Sections 29 and 30 of the Motor Carrier Act of 1980," also known as the "Form MCS-90," is required by federal law, and provides, in part:

> The insurance policy to which this endorsement is attached provides automobile liability insurance and is

amended to assure compliance by the insured, within the limits stated herein, as a motor carrier of property, with Sections 29 and 30 of the Motor Carrier Act of 1980 and the rules and regulations of the Federal Highway Administration (FHWA) and the Interstate Commerce Commission (ICC).

In consideration of the premium stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere. Such insurance as is afforded, for public liability, does not apply to injury to or death of the insured's employees while engaged in the course of their employment, or property transported by the insured, designated as cargo. It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment, within the limits of liability herein described, irrespective of the financial condition, insolvency or bankruptcy of the insured. However, all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding between the insured and the company. The insured agrees to reimburse the company for any payment made by the company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement.

It is further understood and agreed that, upon failure of the company to pay any final judgment recovered against the insured as provided herein, the judgment creditor may maintain an action in any court of competent jurisdiction against the company to compel such payment.

> The limits of the company's liability for the amounts
> prescribed in this endorsement apply separately, to each
> accident, and any payment under the policy because of any
> one accident shall not operate to reduce the liability of
> the company for the payment of final judgment resulting
> from any other accident.

Form MCS-90, p. 1 (docket entry 1, Exhibit A, p. 47).

The operation and effect of a federally mandated endorsement is a matter of federal law. <u>Canal Ins. Co. v. First Gen. Ins. Co.</u>, 889 F.2d 604, 610 (5th Cir. 1989)**;** <u>Canal Ins. Co. v. Coleman</u>, 625 F.3d 244, 247 (5th Cir. 2010)("<u>Coleman</u>"). Congress enacted the Motor Carrier Act of 1980 ("MCA") "in part, to address abuses that had arisen in the interstate trucking industry which threatened public safety, including the use by motor carriers of leased or borrowed vehicles to avoid financial responsibility for accidents that occurred while goods were being transported in interstate commerce." <u>Canal Ins. Co. v. Distrib. Servs., Inc.</u>, 320 F.3d 488, 489 (4th Cir. 2003). The purpose of the MCS-90 endorsement is to "assure compliance" with federal minimum levels of financial responsibility. <u>See</u> 49 C.F.R. § 387.15 illus. 1. The Form MCS-90 must be attached to any liability policy issued to a for-hire motor carrier operating motor vehicles transporting property in interstate commerce. <u>See</u> 49 C.F.R. §§ 387.3, 387.7. The endorsement creates a suretyship, which obligates an insurer to pay certain judgments against the insured arising from interstate commerce activities, even though the insurance contract would have otherwise excluded coverage. <u>Minter v. Great Am. Ins. Co. of N.Y.</u>,

423 F.3d 460, 470 (5th Cir. 2005).

As quoted above, the MCS-90 provides that the insurer agrees to pay, within the limits of liability, "any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 <u>regardless of whether or not each motor vehicle is specifically described in the policy</u> and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere." Form MCS-90, p. 1 (docket entry 1, Exhibit A, p. 47)(emphasis added). Thus, "[t]he MCS-90 provides a broad guaranty that the insurer will pay certain judgments incurred by the insured regardless of whether the motor vehicle involved is specifically described in the policy or whether the loss was otherwise excluded by the terms of the policy." <u>Century Indemnity Co. v. Carlson</u>, 133 F.3d 591, 594 (8th Cir. 1998).

For purposes of the MCS-90 endorsement, "motor carrier" is defined as "a for-hire motor carrier or a private motor carrier. The term includes, but is not limited to, a motor carrier's agent, officer, or representative; an employee responsible for hiring, supervising, training, assigning, or dispatching a driver; or an employee concerned with the installation, inspection, and maintenance of motor vehicle equipment and/or accessories." 49

C.F.R. § 387.5. The regulations implementing the MCA apply only to "for-hire motor carriers operating motor vehicles transporting property in interstate or foreign commerce" and "motor carriers operating motor vehicles transporting hazardous materials, hazardous substances, or hazardous wastes in interstate, foreign, or intrastate commerce." See 49 C.F.R. § 387.3.

In this case, it is undisputed that Jones and Three Rivers Transit were operating a "for-hire motor carrier" and that the carrier was transporting property. It is also undisputed that the carrier was not transporting any hazardous materials, hazardous substances or hazardous wastes. Therefore, the Form MCS-90 applies only if the motor carrier was transporting property in interstate or foreign commerce. Interstate transportation of property is transportation "between a place in a State and ... a place in another State," or "between a place in a State and ... another place in the same State through a place outside of that State." 49 U.S.C. § 31139(b). Foreign transportation of property is transportation "between a place in a State and ... a place outside the United States." Id.

It is undisputed that the Jones vehicle did not travel to a place outside the United States; therefore, the issue is whether it was engaged in the transportation of property in interstate commerce. Coleman, 625 F.3d at 249. It is also undisputed that (1) Jones was transporting a mobile home for C&W Homes ("C&W") from

C&W's headquarters in Vicksburg, Mississippi, to a residential customer in Leland, Mississippi; (2) the accident occurred in Hollandale, Mississippi; and (3) the Jones vehicle did not leave the State of Mississippi. Nevertheless, the Buckner Estate offers several arguments proposing that the trip should be considered as one involving interstate commerce.

First of all, the defendant relies on <u>Royal Indemnity Co. v. Jacobsen</u>, 863 F.Supp. 1537 (D. Utah 1994); <u>Reliance National Ins. Co. v. Royal Indemnity Co.</u>, 2001 WL 984737 (S.D. N.Y. Aug. 24, 2001); and <u>Travelers Indemnity Co. v. Western Amer. Spec. Transp. Serv.</u>, 235 F.Supp.2d 522 (W.D. La. 2002), for the proposition that if the motor carrier is engaged in interstate travel in general, then the accident is covered by the endorsement, despite the fact that the specific trip in question was entirely intrastate.

In <u>Royal Indemnity</u>, Jacobsen (the motor carrier) was, at the time of the accident, hauling alfalfa hay, an agricultural product not subject to ICC jurisdiction under the MCA. The insurer (Royal) argued that the ICC endorsement should therefore not apply to the accident in question. The district court found that the following provisions of the MCA and ICC regulations trumped the fact that the commodity was not subject to ICC jurisdiction:

> Under Section 10927 of the Motor Carrier Act, the ICC can issue an operating permit to a motor carrier only if the motor carrier has filed an adequate "bond, insurance policy, or other type of security ... in an amount not less than ... the Secretary of Transportation prescribes." 49 U.S.C.A. § 10927(a)(1) (West Supp. 1994).

11

Moreover, ICC regulations require that a motor carrier's surety bond or insurance policy be sufficient "to pay any final judgment recovered against such motor carrier for bodily injuries to or the death of any person resulting from the negligent operation, maintenance or use of motor vehicles subject" to ICC regulation. 49 C.F.R. § 1043.1(a) (1993). Finally, in order to assure compliance with section 10927(a)(1) and 49 C.F.R. § 1043.1(a), the form ICC endorsement at issue here must be included in the insurance policies of all ICC registered carriers. See Integral Ins. Co. v. Lawrence Fulbright Trucking, 930 F.2d 258, 261 (2nd Cir.1991); Canal Ins. Co. v. First Gen. Ins. Co., 889 F.2d 604, 611 (5th Cir. 1989).

Id. at 1541 (footnote omitted). In addition, the court cited cases which emphasize the governmental policy behind the ICC endorsement of providing financial protection:

> The Tenth Circuit, in Empire Fire and Marine Ins. Co. v. Guarantee Nat'l Ins. Co., 868 F.2d 357 (10th Cir. 1989), examined the governmental purpose behind the aforementioned requirements. After giving a "brief overview" of the trucking industry and the events leading up to its regulation, the Tenth Circuit found that "the purpose of the [ICC] endorsement was to provide financial protection to members of the public and to shippers." Id. at 366 n.13 (emphasis added)(citing Transamerican Freight Lines, Inc. v. Brada Miller Freight Sys.'s, Inc., 423 U.S. 28, 34, 96 S.Ct. 229, 232, 46 L.Ed.2d 169 (1975)). Later courts have also found this same governmental purpose in their analysis of the ICC endorsement requirement. See, e.g., Canal Ins. Co., 889 F.2d at 611 ([T]he policy embodied in the [financial responsibility] statutes and regulations was to assure that injured members of the public would be able to obtain judgments collectible against negligent authorized carriers."). Moreover, this purpose is found in the ICC's own statements on the issue. See Preamble to 49 C.F.R. § 387.1 (1993)("The purpose of these [financial responsibility] regulations is to create additional incentives to motor carriers to maintain and operate their vehicles in a safe manner and to assure that motor carriers maintain an appropriate level of financial responsibility for motor vehicles operated on public highways.").

<u>Id</u>. at 1541-42. The court then found that

> it would undermine the clear intent of the Motor Carrier
> Act to hold, as Royal argues here, that the Stinsons [the
> injured party] are not protected in this case merely
> because Jacobsen was hauling hay on the day that the
> accident occurred. For example, had Jacobsen been
> hauling manufactured goods ... then Royal would
> apparently concede that the endorsement would apply in
> this case. Yet it is totally fortuitous that Jacobsen
> happened to be hauling hay on the day of the accident
> instead of some other product [which was subject to ICC
> jurisdiction].

<u>Id</u>. at 1542. The court also found that "[a]pplication of the

endorsement should not depend on whether Jacobsen was hauling one

particular type of product on the day of the accident instead of

another. Such an application would not advance the public policy

goals of the Motor Carrier Act in protecting the general public,

and it also would defy common sense." <u>Id</u>. (citation omitted). In

conclusion, the court held that "once issued, bought, and paid for,

the ... ICC endorsement, and the public policy upon which it was

based, provided coverage in this case - regardless of the type of

product that Jacobsen was hauling on the day of the accident in

question." <u>Id</u>. (citation omitted).

    <u>Reliance National</u> addressed the same public policy argument as

<u>Royal Indemnity</u>, but within the context of a wholly intrastate

trip. An independent owner-operator ("McCallum") leased his truck

to an ICC licensed motor carrier ("JRC") engaged in interstate

trucking. During the lease term, the owner-operator also leased

his truck to another company for use as a float in a parade, and

during the parade an individual was struck and killed by the truck. Although the parade trip was wholly intrastate, the district court found that the ICC regulations applied, noting that "the Interstate Commerce Act is a highly remedial statute and its terms are broadly comprehensive enough to bring within them all of those who, no matter what form they use, are in substance engaged in the business of transportation of property on the public highways for hire." Reliance National, 2001 WL 984737 at *3 (citation omitted). The court also noted, "The Act being a remedial statute, it should be liberally interpreted to effect its evident purpose." Id. (citation omitted). Accordingly, the court held "that the ICC regulations concerning the terms of [the] lease apply because it was JRC's intention, at the time it procured McCallum's tractor and services, that the lease be for interstate transport." Id. at *7. As a result, Reliance National was required to tender coverage under the MCS-90 endorsement. Id. at *9.

Royal Indemnity and Reliance National were cited with approval by the district court for the Western District of Louisiana in Travelers Indemnity, which held that a truck leased by a federally registered motor carrier expressly for purposes of engaging in interstate transportation was covered by the MCS-90 endorsement, where "Western" (an interstate motor carrier) had procured the services of a truck owner and operator ("Barnett"), and Barnett was involved in an accident. The court noted that

> [t]he relevant facts of this case ... are virtually
> identical to those in <u>Reliance</u>, in which the court
> ultimately held, "where, as here, an (1) interstate
> carrier, (2) signs an exclusive lease with a trucker to
> perform interstate transport, (3) which references the
> application of ICC regulations in the lease, and (4)
> thereafter provides the trucker with the carrier's ICC
> logo, it would be illogical to hold that the ICC is
> suddenly divested of jurisdiction while the trucker
> performs a single intrastate transport. This would be
> especially incongruous in light of the fact that the
> regulation[s] at issue were promulgated by the ICC at
> Congress' specific direction."

<u>Travelers Indemnity</u>, 235 F.Supp.2d at 530. The court concluded,

"[I]t is clear that Western explicitly intended to procure

Barnett's services for interstate transport, and therefore, the ICC

regulations, in particular the MCS-90 Endorsement, apply to the

trip in question.

The Fifth Circuit Court of Appeals rejected this approach in

<u>Canal Ins. Co. v. Coleman</u>, <u>supra</u>, decided in 2010, specifically

mentioning each of the three cases (<u>Royal Indemnity</u>, <u>Reliance</u>

<u>National</u>, and <u>Travelers Indemnity</u>) as standing for the proposition

that "the truck's procurement or lease agreement, rather than the

circumstances of the particular loss, determine the MCS-90's

application." <u>Coleman</u>, 625 F.3d at 251. Instead, the Fifth

Circuit reasoned: "After reading the plain text of the MCS-90 and

§ 30 [of the MCA], we conclude that the endorsement covers vehicles

<u>only when they are presently engaged in the transportation of</u>

<u>property in interstate commerce</u>." <u>Id</u>. at 249 (emphasis added).

Addressing the split of authority on this issue, the Fifth Circuit

noted:

> Other courts have varied as to whether they determine the MCS-90's application at the time of the loss, but ours appears to be the majority approach. <u>See</u>, <u>e.g.</u>, <u>Century Indem. Co. v. Carlson</u>, 133 F.3d 591, 595 (8th Cir. 1998)(agreeing with "the determination that the grain in question in this case <u>at the time of the accident</u> traveled in interstate commerce" (emphasis added)); <u>Canal Ins. Co. v. J. Perchak Trucking, Inc.</u>, 3:CV-07-2272, 2009 WL 959596, at *2 (M.D. Pa. Apr. 6, 2009)(denying summary judgment because "[c]onsideration of the important issues presented in this case should be made only in the context of a concrete determination as to whether the insured's vehicle was involved in interstate or intrastate commerce <u>at the time of the accident</u>" (emphasis added)); <u>Canal Ins. Co. v. Paul Cox Trucking</u>, 1:05-CV-2194, 2006 WL 2828755, at *4 (M.D. Pa. Oct. 2, 2006)(holding that a federal court has jurisdiction over the question of whether truck was "engaged in interstate commerce <u>at the time of the accident</u>" (emphasis added)); <u>Kolencik v. Progressive Preferred Ins. Co.</u>, 1:04-CV-3507, 2006 WL 738715, at *7 (N.D. Ga. Mar. 17, 2006)("Based on the foregoing, the court concludes that endorsement MCS-90 plays no role in the instant accident because it involved only intrastate commerce from Cartersville, Georgia to Acworth, Georgia with no intention of the dirt ever going beyond Acworth."); <u>Branson v. MGA Ins. Co.</u>, 673 So.2d 89 (Fl. Dist.Ct.App. 1996)(declining to apply the MCS-90 to purely intrastate transportation); <u>Gen. Sec. Ins. Co. v. Barrentine</u>, 829 So.2d 980, 984 (Fl. Dist.Ct.App. 2002) ("The issue is not whether a truck might be used for an interstate shipment in the future. That much could be said of nearly any tractor-trailer rig. Rather, <u>the issue is whether the injury in question occurred while the truck was operating in interstate commerce</u>." (emphasis added)). ...

<u>Id</u>. at 251.

The Fifth Circuit, then, follows the majority approach and employs a trip-specific analysis in determining if the transport was intrastate or interstate. Specifically, the majority view employs a "well settled" method in determining "whether

transportation between two points in [a] State is interstate (or foreign) or intrastate in nature," which "depends on the 'essential character' of the shipment .... Crucial to this determination is the shipper's fixed and persisting intent at the time of the shipment .... Intent is ascertained from all the facts and circumstances surrounding the transportation." <u>Roberts v. Levine</u>, 921 F.2d 804, 812 (8th Cir. 1990)(quoting <u>The May Dep't Stores Co. & Volume Shoe Corp.</u>, No. MC-C-30146 (I.C.C. June 7, 1990, 3 Fed. Carr. Cas. ¶ 37,823, ¶ 47,204)).

"Relevant circumstances include, in particular, the presence (or absence) of certain indicia of 'through carriage' such as through billing; storage-in-transit tariff provisions; uninterrupted movement; continuous possession by the carrier; unbroken bulk; and absence of processing or substantial product modification." <u>Progressive Cas. Ins. Co. v. Hoover</u>, 809 A.2d 353, 361 (Pa. S.Ct. 2002)("<u>Hoover</u>")(citing <u>Texas v. United States</u>, 866 F.2d 1546, 1556 (5th Cir. 1989); <u>Georgia Textile Mach., Inc. v. Federal Express Corp.</u>, 556 S.E.2d 845, 849-50 (Ga. App. 2001)). However, no one factor is determinative. "The intent of the shipper is to be ascertained from the 'bundle of circumstances' that surrounds the movement." <u>United States v. Majure</u>, 162 F.Supp. 594, 598 (S.D. Miss. 1957).

The salient facts of this case, as listed by the plaintiff, are as follows: "(1) Jones was transporting a manufactured home on

Highway 61 from Vicksburg, Mississippi to Leland, Mississippi at the time of the May 5, 2012 accident; (2) the home was manufactured and constructed in Vicksburg, Mississippi [by Cappaert Manufactured Housing, Inc. ("Cappaert")]; (3) the home was sold and delivered from its manufacturer in Vicksburg to a retailer in Vicksburg [C&W Homes, Inc. ("C&W")]; (4) the home remained in Mississippi from the time it rolled off the manufacturing line until the day of the accident when it was being delivered to the retail purchaser and its lawful owner, James Schultz, in Leland, Mississippi."  Reply Memorandum, p. 2 (docket entry 31).

It is undisputed that Jones's trip, on May 5, 2012, originated at C&W's retail sales lot, in Vicksburg, Mississippi, and Jones was hired by C&W to deliver the manufactured home to Schultz's lot in Leland, Mississippi, where the home would later be installed.  It is also undisputed that there was no intent on the part of C&W or Schultz that the manufactured home cross state lines as Jones transported it from C&W's lot in Vicksburg to Schultz's home site in Leland.  A permit issued by the Mississippi Department of Transportation ("MDOT") describes the route, and there are no allegations of any deviation from the route in the permit.  See Deposition of John Parks (General Manager of C&W), pp. 47, 50, 77-78 (Exhibit A to Reply Memorandum); MDOT Permit (Exhibit C to Reply Memorandum).

There is also no dispute that Schultz was the home's legal

owner on May 5, 2012 at the time of the accident. Schultz purchased the home from C&W on April 13, 2012, and title was transferred to him that day. <u>See</u> Purchase Agreement (Exhibit D to Reply Memorandum); Bill of Sale (Exhibit E to Reply Memorandum). As part of the sale, C&W arranged for delivery of the home to Schultz's site, in Leland, Mississippi. Parks Depo., p. 60. C&W contracted with Jones to deliver or "pull" the home to Schultz's site, but Jones was not hired to set-up or install the home. <u>Id</u>., pp. 80-81.

Several months prior to Schultz's purchase, the home was purchased by C&W from Cappaert. <u>See</u> Manufacturer's Invoice (Exhibit E to Reply Memorandum); Manufacturer's Certificate of Origin (Exhibit F to Reply Memorandum). The home originated at Cappaert's manufacturing plant in Vicksburg and was shipped to C&W's retail sales lot, just two miles north of Cappaert's manufacturing facility on Highway 61, in Vicksburg, on or around July 27, 2011. C&W bought the home for use as a "model home" and it was set up and "blocked" on C&W's retail sales lot as such. <u>See</u> Parks Depo., pp. 79-80. As was customary with most of Cappaert's retailers, C&W Homes did not purchase this particular home with the intention of re-selling it, but rather as a "model home." <u>See</u> Deposition of Michael Cappaert (Co-owner of Cappaert), p. 53 (Exhibit B to Reply Memorandum). The home was not moved off of C&W's lot from the time it arrived at C&W's lot in July 2011, until

the day of the accident when Jones was transporting it to Leland, Mississippi.  <u>See</u> Parks Depo., pp. 79-80.  The entirety of the manufacturing process for this home was completed at Cappaert's facility on Highway 61, in Vicksburg, Mississippi.  <u>See</u> Cappaert Depo., pp. 83-84.  From the time Cappaert began its manufacturing process to the moment of the accident, the manufactured home never left the state of Mississippi.  <u>See</u> Parks Depo., pp. 79-80.  At no time from the time of manufacture, including the point of sale, day of delivery, and time of the accident, did Cappaert have any dealings or relationship whatsoever with the consumer, Schultz.  In fact, Cappaert did not even know to whom the home in issue had been sold at the time of the accident.  <u>See</u> Cappaert Depo., p. 71.

The Buckner Estate argues that the transportation in question should be considered interstate for the following reasons: (1) Cappaert uses "raw materials and component parts from multiple locations all over the United States;" (2) "Cappaert manufactures their homes in accordance with federal standards, specifically the National Manufactured Housing construction and Safety Standards Act of 1974 and Department of Housing and Urban Development;" (3) Cappaert, in accordance with industry standards, "follows each manufactured home to the ultimate consumer, insuring installations and set-ups of each home by virtue of a Homeowner's Manual and Installation Instructions which is included with each manufactured home;" (4) "[t]he Homeowner's manual follows both Federal and State

20

safety standards" with which both Cappaert and C&W must comply; (5) Cappaert provides a one-year warranty on its homes "which causes [it] to stay involved with the consumer/homeowner not only throughout the Federal and State mandated installation process, but also[] through any manufacturing/installation issues arising for the first year;" (6) Cappaert sells its manufactured homes to retailers and customers in Louisiana, Arkansas, Texas, Oklahoma and Tennessee, in addition to Mississippi, with Louisiana being first in number of sales; and (7) C&W sells manufactured homes to customers in Arkansas, Louisiana and Mississippi, with forty percent of all sales being to Louisiana customers.

Reasons (2) through (7) are not even remotely related to the inquiry before this Court, which is the shipper's fixed and persisting intent at the time of the shipment. Reason (1) is relevant inasmuch as the route of a shipment, while it "may be entirely within a single state ... may nevertheless be part of a larger, continuing movement in interstate commerce." Hoover, 809 A.2d at 356 (citing Texas v. United States, 866 F.2d at 1553). The Buckner Estate asserts that the home sold to Schultz by C&W, "like all of the homes manufactured by Cappaert, contained component parts and materials which had been shipped from all over the United States to form the necessary and final product in accordance with Federal Regulations, then [sold] to a consumer homeowner." See The Buckner Estate's Memorandum Brief in Support of Amended Response in

Opposition to Motion for Summary Judgment, p. 4.

The issue, then, is whether the initial interstate transportation of component parts and materials "was intended to be only the first leg of shipment." Hoover, 809 A.2d at 356. In Hoover, the court noted a distinction between shipments in "temporary storage" and shipments which "came to rest for manufacturing or processing reasons." Id. at 357 (citations omitted). "[T]he brief storage pending retrieval by a pre-designated broker/customer [would] not disrupt the continuity of the interstate movement." Id. However, "'[w]hen goods moving in interstate commerce reach their ultimate destination, and are reconsigned from that destination on a new contract of shipment to some other point in the same state, the last movement is not interstate.'" Id. at 363 (quoting Boyd v. United States, 275 F. 16, 18 (4th Cir. 1921)(additional citations omitted)).

> As a practical matter of business, any time a shipper moves products to a terminal his ultimate intent is that they be distributed among various consumers at various consuming points. If this is the only intention, the interstate journey ordinarily ends at the terminal. However, if, at the time he moves products to a terminal his present intention is that they merely be put through the terminal on their way to specific consumers at specific consuming points the interstate journey does not end until the products reach those consumers at those points.

Majure, supra, 162 F.Supp. at 601 (quoted in Hoover, 809 A.2d at 364). The Buckner Estate has failed to identify any of Cappaert's suppliers of raw materials and component parts, much less show that

any of them intended their parts and materials to reach "specific consumers at specific consuming points" once they left Cappaert's facility.

Moreover, the "manufacture of an item interrupts the stream of commerce so that after manufacture there is a new commercial journey, either inter- or intrastate." <u>Roberts</u>, <u>supra</u>, 921 F.2d at 815 (citing <u>Crescent Cotton Oil Co. v. Mississippi</u>, 257 U.S. 129 (1921)). The manufactured homes that left Cappaert's facility were "a new commodity, one that had been materially changed in 'character, utility, and value.'" <u>Roberts</u>, 921 F.2d at 816; see also <u>Baltimore & O.R. Co. v. United States</u>, 15 F.Supp. 674, 676 (D.C. N.Y. 1936)("[T]he creation of an article of commerce, as distinct from the packaging, bailing and the like of an existing one, will generally be a terminus of transportation.").

The defendant's argument concerning suppliers of raw materials and component parts fails, because it does not satisfy the "fixed and persisting intent" test. The only products that traveled in interstate commerce were the raw materials and parts shipped to Cappaert from outside the State of Mississippi. The transportation of the manufactured home in this case was entirely intrastate.

Finally, the Buckner Estate argues that there is a genuine issues of material fact, <u>i.e.</u>, whether James Schultz, the owner of the mobile home being transported at the time of the accident, was the "shipper" of the manufactured home, as asserted by Progressive

Gulf.  The defendant points out that Robert McCullough, the "escort" driver traveling ahead of Jones during the transportation of the mobile home, states in his affidavit that he and Jones were delivering the "manufactured home from C&W Homes to James Schultz's site in Leland, Mississippi."  <u>See</u> McCullough Affidavit, ¶ 2 (docket entry 32-1).  The defendant also shows that McCullough, in his deposition, "testified that he had no knowledge of the recipient of the commercial goods (a manufactured home) at issue, had never heard of Mr. Schultz, and further states that his final destination was Arcola, Mississippi, not Leland, Mississippi."  <u>See</u> The Estate of Buckner's Supplemental Filing, p. 2 (docket entry 35).

While these issues of fact may be genuine, the defendant has failed to show that they are material.  McCullough's lack of knowledge does not create a material fact issue when there is other evidence to establish that Schultz was the purchaser of the mobile home.  The discrepancy regarding the location of the site is also immaterial, because both Leland and Arcola are within the State of Mississippi.  Finally, whether Schultz or C&W or even Cappaert were the shipper is immaterial because there are no allegations that any of them intended interstate transportation of the mobile home.

The Court therefore finds that the plaintiff's motion for summary judgment is well-taken.  Neither the policy at issue, Progressive Gulf Insurance Policy 08299832-0, nor the Form MCS-90

Endorsement thereto, provide coverage in this case. In addition, Progressive Gulf has no duty to defend under the policy, nor under the MCS-90 endorsement. As the Fifth Circuit Court of Appeals held in <u>Lincoln General Ins. Co. v. De La Luz Garcia</u>, 501 F.3d 436 (5th Cir. 2007):

> The district court's ruling of no coverage under the terms of the policy necessarily resolved Lincoln General's duty to defend claim. The MCS-90B endorsement does not create a duty to defend claims that are not covered by the policy. <u>Cf</u>. <u>Harco Nat'l Ins. Co. v. Bobac Trucking, Inc.</u>, 107 F.3d 733, 735-36 (9th Cir. 1997) ("[F]ederal courts have consistently stated that the MCS-90 endorsement does not create a duty to defend claims which are not covered by the policy ....")(citing <u>Canal Ins. Co. v. First Gen. Ins. Co.</u>, 889 F.2d 604, 612 (5th Cir.1989), <u>modified on other grounds</u>, 901 F.2d 45 (5th Cir.1990)).

<u>Id</u>. at 439 n.3.

Accordingly,

IT IS HEREBY ORDERED that the plaintiff Progressive Gulf Insurance Company's Motion for Summary Judgment **(docket entry 13)** is GRANTED. The plaintiff shall submit a proposed Final Declaratory Judgment in this case within seven (7) days from the date of entry of this Memorandum Opinion and Order.

SO ORDERED, this the 1st day of August, 2013.

<u>/s/ David Bramlette</u>
UNITED STATES DISTRICT JUDGE
